### LACLEDE STEEL CO. v. SILAS MASON CO.

#### Civil Action No. 1721.

District Court, W. D. Louisiana, Shreveport Division.

July 25, 1946.

W. Scott Wilkinson and Wilkinson, Lewis & Wilkinson, all of Shreveport, La., and Lewis, Rice, Tucker, Allen & Chubb, of St. Louis, Mo., for plaintiff.

Malcolm E. Lafargue, U. S. Atty., and John H. Overton, Jr., Asst. U. S. Atty., both of Shreveport, La., for defendant.

PORTERIE, District Judge.

Plaintiff operates steel mills, buying scrap iron for remelting purposes and fabrication into steel products; defendant was in the business of operating an ordnance plant, supplying ammunition and other ordnance materials to the United States Government, and as an incident to its business, accumulated and sold large quantities of scrap of various kinds for remelting purposes, including ferrous and non-ferrous materials.

Tin ammunition containers are of ferrous metal, scrap material; aluminum washers are of non-ferrous metal. Under the rules and regulations of the Office of Price Administration and War Production Board a combination of ferrous and non-ferrous materials was prohibited.

Defendant issued an invitation to bid on certain items of scrap material, including the following: "8. Aluminum, Miscellaneous Scrap Ammunition Components, Fuzes, etc. 11. Tin (Ammunition Containers Compressed.)"

The invitation to bid provided that: (a) Purchaser warrants that the purchase and all future transactions with the property would be in accordance with the rules and regulations of the Office of Price Administration and War Production Board, and (b) purchaser agrees to sell and ship or use the items purchased only as scrap.

Joseph Schultz, operating as Southwestern Iron & Supply Company, inspected the above items 8 and 11, located in separate bins or piles at defendant's plant and thereafter submitted his bid therefor, which was accepted. Schultz informed defendant to load the item No. 11 for shipment but to hold item 8 for later shipment with non-ferrous metals. Defendant advised Schultz that it had bundled and compressed this item No. 11 and had loaded it at its plant in car T&P 17579 for shipment.

In paragraph 7 of the complaint it is alleged:

"Petitioner had previously ordered a quantity of steel scrap from the Standard Steel and Rail Company of St. Louis, who, in turn, had contracted to buy said carload of compressed ammunition containers from Schultz and directed him to ship same to petitioner. Schultz thereupon ordered out on bill of lading dated August 13, 1945, from defendant's plant, the car of compressed ammunition containers (item number 11) to plaintiff, via Louisiana & Arkansas Railway Company, with the bill of lading reciting the contents thereof as '1 C/L Scrap iron having value for remelting purposes only,' and all of which was known to defendant."

The shipment was inspected by plaintiff upon arrival at its plant in Alton, Illinois, found to be in accordance with the specifications and a large number of the compressed blocks of ammunition containers were then placed in two of plaintiff's open hearth furnaces with the result that within a period of a few hours, the heat of steel went through the furnaces, with a

resulting damage of $86,707.47 to plaintiff, the amount sued for in this action.

An immediate inspection was made by plaintiff of several of the blocks of ammunition containers, which had not been placed in the furnaces, disclosing that the containers (ferrous metals) had been loaded with and contained aluminum washers (non-ferrous metals) which had been concealed by defendant from plaintiff, the defendant having blocked or compressed together parts of said items Nos. 8 and 11.

Plaintiff has charged defendant with responsibility and liability for the loss sustained by it, in the following language:

"(a) In unlawfully, negligently, and carelessly, mixing, concealing and compressing aluminum washers, non-ferrous metals, within the compressed ammunition containers, which are of ferrous metal, when defendant knew, or in the alternative, should have known that such compressed blocks were to be remelted, and that, if remelted in such combination, same would be extremely dangerous to life and property.

"(b) In unlawfully, negligently, and carelessly mixing, compressing, and concealing aluminum inside of the ammunition containers, contrary to the purchaser's instructions, and in violation of the orders and regulations of the Office of Price Administration and the War Production Board under which the invitation to bid had been tendered by defendant and the bid therefor accepted, as hereinabove set forth, thereby producing an extremely and inherently dangerous combination of metals for remelting purposes—the only purposes for which such scrap material could be utilized, as defendant well knew.

"(c) In unlawfully, negligently, and carelessly manufacturing, selling and placing upon the market a product which defendant warranted to be a ferrous metal fit for remelting purposes, when defendant knew that a non-ferrous metal was concealed therein, resulting in a combination known to be inherently dangerous to life and property when used for the purposes intended and commonly used."

These contentions (a), (b), and (c) represent an action grounded in tort. Then

the complaint, in the following language, sets out an action ex contractu:

"The warranty of defendant that the Tin (Ammunition Containers Compressed) was a ferrous metal fit for remelting purposes existed in plaintiff's behalf and inured to it as the ultimate purchaser and consumer of said product, which warranty plaintiff relied upon, with the resulting damages, as alleged herein, to it by reason of defendant's breach of said warranty."

The defendant has filed a motion to dismiss for the reason that the plaintiff fails to state a claim against defendant upon which relief can be granted. The substance of the motion is that plaintiff has no cause to recover damages either (1) in contract or (2) in tort. Under (1) there is want of privity, and, more, the article sold is alleged to be not one inherently or imminently dangerous so as to make the seller liable for injuries to the person or property of any consumer or user, who has no direct contractual relation with the seller; that the seller of this article was not liable to a remote purchaser, since it did not fall into one of the allegedly generally accepted exceptions established by jurisprudence, to-wit: Articles intended for human consumption, such as foods, drugs and beverages; explosives; firearms; oils and other highly combustible substances; in most jurisdictions, automobiles; and a few miscellaneous items which have been held in isolated cases to be imminently dangerous to life and health.

Under (2) of the motion, which is that phase of plaintiff's complaint which alleges a tort committed by defendant in packing negligently ferrous material with non-ferrous material, the position of defendant is that in the absence of warranty by the seller to a remote buyer and of privity between the two litigants, there is no legal duty due by the defendant to the plaintiff from which a tort action could spring.

The well-pleaded facts of the complaint, excluding all conclusions of law, are to be accepted as proved. The action as to breach of contract, and the action in tort are separate, though concurrent. Illinois Central R. Co. v. New Orleans Terminal Co., 143 La. 467, 78 So. 738; Englert

v. New Orleans Ry. & Light Co., 128 La. 473, 54 So. 963, 967; Schoppel v. Daly, 112 La. 201, 36 So. 322 (Headnote 1).

All the jurisprudence furnished by both sides on the liability of the *manufacturer* to the subvendee for breach of warranty may be taken as persuasive, for in this case we have a *packer* of ferrous with non-ferrous materials which for generally intended purposes becomes a dangerous and damage-causing bundle. There is the analogy of the packer with the manufacturer in that the packer in the instant case, from the facts alleged, and particularly that the rules and regulations of the O.P.A. and W.P.B. prohibited a combination of ferrous and non-ferrous materials, warranted to the world not to mix the two materials in one bundle; if not to the world, at least to those buying upon this publicly-advertised condition.

The legal proposition advanced by defendant relates back to 1842 and to the English case of Winterbottom v. Wright, 10 M. & W. 109, 152 English Reprint 402, in which the Court of Exchequer held that the buyer of a motor coach, who was injured as a result of defects in the construction of the coach, could not recover from the manufacturer who had sold the coach to the Postmaster General because of lack of privity of contract. This doctrine has been very modified by subsequent cases and the tendency of the courts is to abandon it in its entirety. A decided departure was first effected by the great opinion of the late Mr. Justice Cardozo (52 Harv. L. Rev. 376), 1916, in the case of McPherson v. Buick Motor Company, 217 N.Y. 382, 111 N.E. 1050, L.R.A.1916F, 696, Ann.Cas. 1916C, 440.

"In many recent cases that asserted general rule of nonliability to persons not in privity of contract has been denied, either in terms or in effect, and the principle stated earlier in this opinion has been applied.

"The time has come for us to recognize that that asserted general rule no longer exists. In principle it was unsound. It tended to produce unjust results. It has been abandoned by the great weight of authority elsewhere. We now abandon it

in this commonwealth." Carter v. Yardley & Co., 319 Mass. 92, 64 N.E.2d 693, 700.

In United States Radiator Corporation v. Henderson, 10 Cir., 68 F.2d 87, certiorari denied, 292 U.S. 650, 54 S.Ct. 860, 78 L.Ed. 1500, it was held that in an action by home owners against a boiler manufacturer for loss of the building and contents by fire, whether the fire was caused through negligent design and construction of the furnace purchased from a local dealer was for the jury to determine. There is a full citation of the authorities in this case. See, also, Huset v. J.I. Case Threshing Machine Co., 120 F. 865, 61 L.R.A. 303, referred to in 17 A.L.R. 674.

Movant stresses the case of Moore v. Jefferson Distilling & Denaturing Co., 169 La. 1156, 126 So. 691, from which decision it has quoted in extenso.

The facts in that case are as follows (digest accepted from case of Gordon v. Bates-Crumley Chevrolet Co., 158 So. 223, at page 230): "One Putzell purchased steel drums from defendant, who had not manufactured them, and sold them to the Marland Refining Company. After being imperfectly inspected, they were shipped directly by the purchaser to the Lucas E. Moore Stove Company, at Southport, La. to be filled with gasoline under a contract with the Marland Refining Company. While the drums were being unloaded, it was discovered that some of them contained a dark gritty deposit which colored the gasoline when mixed in a test tube. While examining the interior of one of the drums through the bunghole, Mr. Putzell imprudently applied a lighted match to the hole, causing an explosion which fatally injured Lucas E. Moore. Suit was instituted by the widow of deceased, in the capacity as tutrix of her minor child, to recover damages from the defendant on the ground of negligence in selling drums, supposed to have never been used, but which in fact had been used and contained small quantities of explosive liquids."

While it is stated in the headnote of the case that a vendor of an article is liable to strangers to a contract of sale for his negligence only when the article is "intrinsically and inherently dangerous" to life and limb, the true basis for the decision rejecting the plaintiff's demand was that the negligence of the defendant, if any, was not the proximate cause of the injury. See Restatement of the Law of Torts, Louisiana Annotations, Sec. 399.

In short, as pointed out in Maggiore v. Laundry & Dry Cleaning Service, Inc., La. App., 150 So. 394, 397, the proximate cause of the accident was the unexpected act of a third party (Putzell) in holding a lighted match in the bunghole of the drum.

■ Even if the doctrine under the Moore case, supra, be that recovery in a case where there is lack of privity is restricted to where an article was intrinsically and inherently dangerous, it may not serve to prevent recovery in the instant case, because the packing of the ferrous and the non-ferrous materials together and giving the bundle the appearance of containing only ferrous material, and sold under the W. P. B. and O. P. A. guaranty against such mixture, made the bundle, when used for the intended purposes, intrinsically and inherently dangerous to life and property.

"The general rule stated and illustrated by the previous annotations, that a manufacturer or packer of a defective article is not liable for injuries to the person or property of an ultimate consumer purchasing through a middleman, with the possible exception of articles inherently dangerous to life or property—at least in the absence of knowledge of any defect existing at the time of release into the channels of trade—based upon the theory that such parties do not stand in any contractual relationship, has, while professedly recognized, been constantly restricted in its application by an increasing number of modern cases which recognize and enforce exceptions thereto." 142 A.L.R. 1490.

Now the Louisiana cases say as follows:

"The weight of authority clearly preponderates in favor of plaintiff's contention that the manufacturer of an automobile is responsible in damages to the purchaser thereof from one of its dealers and distributors, because of defects in parts and material, or incompetent assemblage or workmanship therein. In such case it has been often held that the manufacturer owes

a duty to the public to see that defects in the machine, or the material carried into its construction, possible for it to determine, shall be entirely eliminated. If the defect could have been discovered by the exercise of the utmost human skill and foresight, it is negligence not to have discovered it. Negligence is imputed when the machine fails for any of said reasons.· Berry on Automobiles, Vol. 2, p. 1504 et seq.;· Huddy, Cyclopedia of Automobile Law, Vol. 9, 10, p. 315;ʾ Cohen v. [Broadway] Motor Truck Corporation, 240 App.Div. 18, 268 N.Y.S. 545; McPherson v. Buick Co., 160 App. Div. 55, 145 N.Y.S. 462; Quackenbush v. Ford Motor Co., 167 App.Div. 433, 153 N.Y.S. 131; Johnson v. Cadillac Co., 2 Cir., 261 F. 878, 8 A.L.R. 1023. * * * The manufacturer is subject to rules much more strict than is the seller." Gordon v. Bates-Crumley Chevrolet Co., La.App., 158 So. 223, 231.

"* * * our courts in numerous cases have recognized the right of a consumer to sue the manufacturer in a direct action for alleged damage sustained because of negligence on the part of the manufacturer in manufacturing, preparing, and bottling foods and beverages, although the consumer did not purchase the article directly from the maunfacturer, but from a dealer who in turn had purchased from manufacturer." Auzenne v. Gulf Public Service Co., La.App., 181 So. 54, 55.

A note on the warranty of quality in a sale, and the liability of a manufacturer to the buyer for his product appears in 14 Tulane Law Review 470-472. The side commentary is made that the Louisiana Code and the original French sources join the modern tendency first given release in the United States by Judge Cardozo in McPherson v. Buick Motor case, supra, expressed in the following language:

"It is arguable that Article 2503 of the Louisiana Civil Code of 1870, as amended by Act 116 of 1924, which provides that the buyer is subrogated to the seller's rights and actions against all others, gives rise to the same rule in Louisiana as that which prevails in France. In spite of the fact that Article 2503 is found in the section dealing with warranty against eviction, it appears sufficiently broad to cover warranty of quality as well. Under modern conditions of marketing, with the ubiquitousness of the middle man, it appears that the French solution best protects the final purchaser, who can least afford a loss. Surveys have indicated that manufacturers themselves have disregarded the notion of privity and have assumed responsibility to sub-vendees. See Bogert and Fink, Business Practice Regarding Warranties in the Sale of Goods, 25 Ill. L. Rev. 400, 416 (1930). Moreover, it is no longer the dealer's representations, but those of the producer, which create a demand for standard products. Continued strict adherence to the 'magic of the metaphysics of privity' will eventually prove to be a prolific ground for, fraud. In view of the history of the action on a warranty, and in consideration of current merchandising and advertising systems, the court in the instant case (Bahlman v. Hudson Motor Car Company, 1939, 290 Mich. 683, 288 N.W. 309) reached an equitable result without departing seriously from legal tradition. See Williston, op. cit. supra, at p. 490, § 244(a); Vold, Handbook of the Law of Sales (1931) 474, § 152."

The brief of plaintiff's counsel has this, with which we must agree:

"The bundles of scrap which were sold by defendant are in the same category as food placed in the can by a manufacturer, for the bundles of scrap were compressed and there was no opportunity for other than the customary visual inspection. This condition rendered the scrap comparable to the placing of food in cans by a manufacturer, which likewise affords no opportunity for inspection. According to the complaint, defendant knew that it was selling ferrous scrap at ferrous scrap prices to be consumed by melting, and the inclusion of the aluminum washers was the same as the inclusion of a foreign substance in canned food. The only difference is the former is injurious to the person, the latter, in this manner was injurious to the property of plaintiff, but could have been the cause of injury and death of plaintiff's employees. The difference is immaterial with respect to the right for recovery. When the ferrous scrap and non-ferrous aluminum were placed for consumption in the furnace for which the scrap was intended, the damage

occurred directly as a result thereof. The scrap when so combined by plaintiff became inherently dangerous, both to person and property."

"The seller, who knows the vice of the thing he sells and omits to declare it, besides the restitution of the price and repayment of the expenses, is answerable to the buyer in damages." Article 2545, Louisiana Civil Code.

"But whether warranty be excluded or not the buyer shall become subrogated to the seller's rights and actions in warranty against all others." Article 2503, Louisiana Civil Code.

See George v. Shreveport Cotton Oil Co., 114 La. 498, 38 So. 432; Christie & Lowe v. Pennsylvania Iron Works Co., 128 La. 208, 54 So. 742, 753; Crawford v. Abbott Automobile Co., Ltd., 157 La. 59, 101 So. 871.

The case of Richardson v. Beverung & Burg, 5 La.App. 280, which is advanced by movant, did not involve an action in warranty but actually an action of quanti minoris under C.C. Art. 2520 et seq. The following language from the case 5 La.App. at page 281 proves this:

"The defendant's answer is essentially an action for the reduction of the price of the animals sold for which the note sued on was given, an action quanti minoris C.C. 2520-2548. This action lies only on behalf of the purchaser against his immediate vendor."

Considering this case from the contract side, and the implied warranty that traveled with the contract, we have used the facts in connection with the law of Louisiana to this time, but the controlling law in this contract may be the law of the State of Missouri, for the plaintiff, a resident of Missouri, ordered from the Standard Steel and Rail Company of St. Louis, which, in turn, bought from one Schultz, and Schultz bought from the defendant.

The relation might be a little closer between the plaintiff and the defendant, obviating Missouri laws, because the allegation in the complaint is:

"Schultz thereupon ordered out on bill of lading dated August 13, 1945, *from defendant's plant,* the car of compressed ammunition containers (item number 11) *to plaintiff,* via Louisiana & Arkansas Railway Company, with the bill of lading reciting the contents thereof as '1 C/L Scrap iron having value for remelting purposes only'." (Italics ours.)

The place of delivery was Louisiana because title passed in Louisiana when the ferrous scrap was delivered to the carrier in Louisiana, consigned to the plaintiff.

However, if it be considered that the place of sale from Schultz to the plaintiff was in St. Louis, Missouri, and the laws of Missouri should apply, the Missouri contract law on this subject is substantially the same as, or if anything more favorable than, that of Louisiana. See Roettig v. Westinghouse Electric & Mfg. Co., D.C.E. D.Mo., 53 F.Supp. 588; McLeod v. Linde Air Products Co., 318 Mo. 397, 1 S.W.2d 122, 126. Quoting from the latter case, we have:

"The early cases limited exception 1 to things in their nature destructive, such as poisons, explosives, and deadly weapons. * * * We think the exception should be extended to include 'a thing which when applied to its intended use becomes dangerous,' although not inherently so. There is no reason why the principle should not apply to things imminently dangerous, whether inherently so or not."

"Generally speaking, the place of making a contract is determined according to the parties' intention; as a rule, it is considered to be the place where the offer is accepted, or where the last act necessary to a meeting of the minds or to complete the contract is performed." 17 C.J.S. Contracts, § 356, page 813.

If the laws of the state of Illinois were to apply, because the freight car was consigned from Minden, Louisiana, the home of the defendant, to the plant of plaintiff at Alton, Illinois, the liability of the packer of the defective article for injury to person or property of ultimate consumer, who purchased from middleman, applies in the state of Illinois.

"We think the rule in this state is that when an article is constructed by a manu-

facturer for others, and, by reason of negligence, uses defective material or fails to use ordinary care in testing and inspecting the article after it is manufactured and before it is put into use, and by reason thereof persons using the same are likely or liable to be injured, such manufacturer or one who holds himself out to be the manufacturer, is liable to such person who suffers injury, through such negligence, while using such article in a proper manner. This is true even though there be no privity of contract between the manufacturer and such persons." Lill v. Murphy Door Bed Co., 290 Ill.App. 328, 8 N.E.2d 714, 720.

See, also, Rotche v. Buick Motor Co., 267 Ill.App. 68, reversing on other grounds, 358 Ill. 507, 193 N.E. 529.

There is a trend in our Louisiana jurisprudence, as well as over the whole United States, for the "magic of the metaphysics of privity" to be no more applied. An examination of eight A.L.R. notes (1922 to 1943) discloses a rapid growth of the movement. The question before us is whether it is timely for us to join the movement with this case. We believe so. The doctrine of the civil law in sales of movables is that of caveat venditor; the seller warrants unless there be special agreement to the contrary. Of all states, therefore, Louisiana should be the first and should be in the lead.

The defendant knew it was selling ferrous scrap at ferrous prices, to be consumed by melting. It advertised its sale, calling attention to the prohibition by the rules and regulations of the O.P.A. and W.P.B. of packing in combination ferrous and nonferrous materials. It compressed the mixed scrap into bundles with its own hydraulic pressers, and the movement by rail was immediately from defendant's Louisiana plant to the complainant's plant on a bill of lading reciting "having value for remelting purposes only." This is a warranty by the defendant, direct and implied, to the complainant.

We again quote from 142 A.L.R. 1495:

" * * * several recent cases have indicated a tendency to extend the theory of implied warranty or the analogous rule of public policy so as to allow the maintenance of such an action independently of negligence or of the traditional views as to the necessity of privity of contract."

So, we must overrule the motion to dismiss on the ground that no relief can be granted because there was no warranty ex contractu, and because of want of privity.

Now, as to the tort phase, Article 2315 of our Louisiana Code says:

"Every act whatever of man that causes damage to another, obliges him by whose fault it happened to repair it * * *."

In plain tort law, the neglectful packing of the ferrous and non-ferrous material by the seller in this case in bundles that proved deceitful, in that the aluminum washers in the bundles were not to be seen, became the proximate cause of the injury and consequent damage to the plant of plaintiff.

So, under the laws of Louisiana, and particularly Article 2315, ignoring the contract side of the case, the motion to dismiss must again be overruled. See Restatement of Conflict of Law, Sec. 65; Wilson Zurich General Accident & Liability Ins. Co. v. National Casualty Co., La.App., 191 So. 574; Gordon v. Bates-Crumley Chevrolet Co., supra; Roettig v. Westinghouse Electric & Mfg. Co., supra; Steber v. Kohn, 7 Cir., 149 F.2d 4.

This case will be tried with jury, as the complainant has pleaded for a jury. It will be for the jury to determine from the facts furnished them if all the elements of a tort exist, such as (1) that the neglectful act of defendant in mixing the two types of material when baling for shipment, upon the advertisement made, was the proximate cause of the injury to the property of the plaintiff; (2) that the negligence of defendant and the resulting injury must be known by common experience to be a natural and usual consequence, that is, according to the usual course of events, the accident follows the negligence; and (3) the proof of negligence must be sufficiently strong and must prove with reasonable certainty that the alleged damage to plaintiff's plant resulted from defendant's neglectful baling, improper labeling, and the mixture of ferrous with non-ferrous materials, and that no act of plaintiff, such as

the non-inspection of the inside of the bales, bars the plaintiff by its own contributory negligence.

In general, the tort must be in the breach of a legal duty comprising three distinct elements, to-wit: (a) Existence of legal duty from defendant to plaintiff; (b) breach of that duty; and (c) the damage as a proximate result. Penton v. Sears, Roebuck & Co., La.App., 4 So.2d 547; Factors' & Traders' Insurance Co. v. Werlein, 42 La.Ann. 1046, 8 So. 435, 11 L.R.A. 361; Savoie v. Walker, La.App., 183 So. 530; Adkins v. New Orleans Railway & Light Co., 2 La.App. 130; Mournet v. Sumner, 19 La.App. 346, 139 So. 728; Riggs v. Standard Oil Co., C.C., 130 F. 199; Standard Oil Co. v. Parrish, 7 Cir., 145 F. 829; Louisiana Oil Refining Corporation v. Reed, 5 Cir., 38 F.2d 159; Morris v. E. I. DuPont de Nemours & Co., 8 Cir., 68 F.2d 788.

Judgment in consonance with the above opinion will be signed upon presentation.